# EXHIBIT D

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the
internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4178-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DENARD C. TRAPP,

    Defendant-Appellant.

_____

Submitted March 1, 2021 – Decided July 15, 2021

Before Judges Currier and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law
Division, Monmouth County, Indictment No. 18-11-
1516.

Joseph E. Krakora, Public Defender, attorney for
appellant (Stefan Van Jura, Assistant Deputy Public
Defender, of counsel and on the brief).

Christopher J. Gramiccioni, Monmouth County
Prosecutor, attorney for respondent (Carey J. Huff,
Assistant Prosecutor, of counsel and on the brief).

PER CURIAM *was issued because, the facts does not align with the law, statutes or facts. What merits was deliberated?*

Defendant appeals from his conviction of fourth-degree stalking, N.J.S.A.

2C:12, after a jury trial.  He also challenges his sentence as excessive.  We

affirm.                     *False premise," I still own 18 Marland Lane*

The events that led to defendant's charges arose out of his prior ownership

of a home in Tinton Falls.  He defaulted on the mortgage in 2012, and the court

entered a final judgment of foreclosure in 2014.  After the property was sold at

a sheriff's sale in 2015, defendant sought unsuccessfully to stay his removal

three times.  In April 2016, defendant was forcibly removed from the property.

We affirmed the trial court's order.  GDBT 1 Tr. 2011-1 v. Trapp, No. A-1489-

15 (App. Div. July 5, 2017) (slip op. at 1).  *Does not have standing*

Despite these orders, the sale of the property, and defendant's removal

from the premises, he continued to return to the home.  On September 12, 2016,

defendant was arrested at the property when he returned there after being

advised by law enforcement not to do so on multiple occasions.  On that day,

defendant nailed a piece of plywood across the property's front door and pushed

and wrestled with officers as they attempted to handcuff him.  He was

subsequently charged with: (1) fourth-degree criminal trespass, N.J.S.A. 2C:18-

3(a); (2) third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3)(a); and (3) fourth-

2

degree aggravated assault on a law enforcement officer, N.J.S.A. 2C:12-1(b)(5)(a).

While defendant was out on bail and awaiting trial on the charges arising out of the September 2016 events, the property was sold to Kevin Downey and his girlfriend, Janine Marsico, on August 17, 2018.  Because the birth of their second child was imminent, the couple did not go to the property or move in until September 6.  On that day, Kevin, Janine, their two-year-old child, and newborn baby were at the home when defendant knocked on their front door. When Janine answered the door, defendant informed her the property was his home and it was "under litigation."  Defendant also gave Janine some documents to give to her attorney.

Although the interaction lasted only a couple of minutes, Kevin told Janine to shut the door because he found defendant's statements "a little concerning."  Janine called the Tinton Falls Police Department who asked her to come in and make a statement.  Because the couple was returning to their prior home to continue packing, they decided they would "take it up" the next time they were in Tinton Falls.  Could not be too concerned

The family next returned to the property on September 9.  Defendant again appeared and rang the doorbell.  When Kevin answered the door, defendant

3                                                    A-4178-18

reiterated that the property belonged to him and he tried to give Kevin some documents. When Kevin refused to take the papers, defendant left. Kevin testified that, although defendant made no threats, the conversation was "more animated" and not "as friendly" as the first interaction. Kevin felt defendant was becoming "more frustrated."

These interactions left Kevin feeling "very uneasy," because he believed defendant was not "just . . . showing up randomly" but instead was "clearly planning it." Janine was "shaken [and] scared." Therefore, the couple again called the police.

Patrolman Brian Cahill responded to the call. He described Janine as "trembling" and looking "[p]hysically upset, distressed, emotionally alarmed, [and] nervous." According to the officer, Kevin looked "[n]ervous, . . . alarmed, [and] stressed out." After the couple explained what had transpired, Cahill called defendant and instructed him not to return to the property or he would be charged with trespassing. Defendant responded that he intended to return because he was still receiving mail at the property. Cahill reiterated to defendant that he could not return to the home.

On September 14, 2018, the family returned to the property a third time to continue moving in. As Kevin was removing his two-year-old son from the

A-4178-18

car, defendant drove up to the home's mailbox, got out of his car, and began going through the mailbox.  When Kevin asked defendant what he was doing, he replied: "Getting my mail from my mailbox.  This is my house."  After Kevin asked defendant to leave, he told Kevin he was "a bitch" and to "go get a new address."  Kevin testified defendant was yelling "loud enough for the neighbors to call the police."

As this incident was unfolding, Janine "locked herself in the car and called the police[.]"  Defendant left when Kevin told him the police were on their way. This interaction left the couple feeling even more fearful and uneasy and prompted them to implement safety measures at the property such as installing cameras, a security system, and a secure mailbox.

The police arrested defendant the following day.  He was subsequently charged in an indictment with: (1) fourth-degree stalking, N.J.S.A. 2C:12-10; and (2) fourth-degree criminal trespass, N.J.S.A. 2C:18-3(a).[1]  He was detained pending trial.

In February 2019, defendant represented himself at trial on the first indictment with standby counsel.  He was convicted of third-degree resisting arrest and sentenced to four years in prison.

---

[1]  The State dismissed this charge prior to trial.

Defendant appealed, asserting error in the conduct of the jury deliberations. We agreed and in an unpublished opinion also issued on this date, we vacated the conviction and sentence and remanded for a new trial. State v. Trapp, No. A-3629-18 (App. Div. July 15, 2021).

The trial on the stalking charge that is the subject of this appeal took place in March 2019. Defendant again represented himself with standby counsel. Officer Cahill testified about his visits to the property, his observations of Kevin and Janine on September 9, and his phone call to defendant instructing him not to come back to the home. As Cahill was explaining the reason why he called defendant, he began to say: "At that point, due to the history at the [property], [and] the continuous calls to the residence. . . ." The judge cut the officer off before he could continue, advising it was "inappropriate hearsay."

Defendant then cross-examined Cahill, inquiring whether he saw "any documentation or anything proving it was [defendant's] house or it wasn't [defendant's] house." Cahill responded that he had not seen any documentation, but "speculated [it was not defendant's house] due to previous encounters and what [he] was informed of . . . ." Cahill indicated he was referring to previous encounters defendant "had at that residence." Cahill, on redirect, clarified that although he personally had no interaction with defendant prior to September 9,

6

2018, other officers had informed him that defendant had previously been told not to go to the property.

On recross-examination, defendant continued to question Cahill about his knowledge of the ownership of the property and whether he was aware that "[the police] had problems with knowing the ownership of the property . . . ." When the prosecutor objected, defendant responded, "I have documentation from another officer who made a written report that says just that." After the judge sustained the objection, defendant complained that "everything [he] tr[ied] to introduce in evidence [was] objected" to. The following sidebar ensued:

> THE COURT: This is for [defendant]'s ears. You'll recall when I qualified him to represent himself, he said he was familiar with the rules. Well, clearly he's showing me he is not. He doesn't understand that each individual objection is ruled on individually based on its merits and there's no keeping score. It's just a matter of ruling on whatever it is. If he wants to go back to another case, he can't because it's not relevant. If he wants to ask this officer questions based on something that was brought up on the redirect, that's what he's limited to just like any attorney. So, that's the limitation.

> [DEFENDANT'S STANDBY COUNSEL]: And I think, Judge, it appears that . . . the door was opened when this officer said when he heard from other officers about the times that [defendant] had been at the property.

> . . . .

7

[THE STATE]: I would happily acknowledge I opened
a door to some areas.  However, what [defendant]'s
trying to do is use . . . one line out of a [police] report
which he tried to do in the previous trial with the officer
and the officer explained that's not what's meant in that
one statement but now he's going to try to do it with a
different officer who doesn't know the explanation by
the prior officer, so he's falsely misleading this jury.

THE COURT: [Defendant] also doesn't even know
whether this officer ever saw that report.  So, we're
going down a road that we're not going down.  Let's
move on. Next question, please, Mr. Trapp.

Defendant, however, immediately returned to questioning Cahill about the

police report.  Cahill confirmed the report was written by a Tinton Falls police

officer and, at defendant's direction, read the following line from the report:

"from January 1, 2016 to September 13, 2016, TFPD has been called to [the

property] nine times for issues pertaining to ownership of the property."

Defendant then inquired: "Pertaining to ownership of the property.  And all that

time, did they ever, to your knowledge, find out who were the true owners?"

Cahill responded "no."

The prosecutor then asked further questions of Cahill regarding the report:

[THE STATE]: Sir, again, this is not your report,
correct?

[PATROLMAN CAHILL]: Correct.

[THE STATE]: Okay.  It was by Corporal Grimm?

8

A-4178-18

[PATROLMAN CAHILL]: Yes.

[THE STATE]: An officer you work with?

[PATROLMAN CAHILL]: Yes.

[THE STATE]: Okay. It's completely unorthodox to do this; however, [defendant] had you read one line in that report but it's taken out of context. So, I just want to have you finish reading the first . . . paragraph.

[PATROLMAN CAHILL]: Okay. It should be noted that at approximately 1800 hours on September 7, 2016, I responded to the same location for a similar-type incident where a contractor Salvatore doing work at that location contacted TFPD because [defendant] was trespassing on the property. . . . During that previous call for service [defendant] was warned for the second time . . . that he was not allowed on the property ... and that he was trespassing by coming onto the property.

At the conclusion of that call for service, [defendant] was advised to leave the property and did so without incident. Also from January 1, 2016 to September 13, 2016, TFPD has been called to [the property] nine times for issues pertaining to the ownership of the property.

[THE STATE]: Now, you don't know what that . . . last sentence that . . . [defendant] had you read, nine times for issues pertaining to ownership of the property, you don't know specifically what . . . Corporal Grimm was referring to at that point, correct?

[PATROLMAN CAHILL]: Correct.

[THE STATE]: Okay. But [there] clearly . . . were discussions about officers [who] went to that residence

9

on multiple prior occasions to let that man sitting there
know he's trespassing on the property, correct?

[PATROLMAN CAHILL]: Correct.

[THE STATE]: The State has no further questions.

[DEFENDANT]: I object to . . . the leading nature of
that question.

THE COURT: Overruled.  Do you have any further
questions of the officer based on that report, sir?

[DEFENDANT]: No.

Defendant elected to testify on his own behalf.  He did not dispute that he
went to the property on the three occasions in September 2018 and interacted
with Kevin and Janine as described.  He also did not dispute that Officer Cahill
called him and told him not to return to the property.  Instead, defendant
continued to dispute the legitimacy of his mortgage and the foreclosure
proceedings.

As stated, the jury convicted defendant of the stalking charge.  During the
sentencing hearing, the judge noted defendant's "five municipal court
convictions, including assault and resisting arrest, trespass, and possession of a
weapon", and that the present offense was his second indictable conviction.  The
judge then recounted the "creepy" circumstances of the case and wondered how

10

A-4178-18

"[defendant] conveniently arrive[d] at the property the days that [Kevin and Janine] arrive[d.]"

The judge found defendant's conduct demonstrated "a total disregard for the law and for the [c]ourt's authority, and for the legal process." He stated defendant "[took] no responsibility for his action[s]" and instead took the position that the mortgage company "was not licensed to do business in . . . New Jersey and therefore, everything they did was fraudulent", even though defendant's statements "could not [have] be[en] further from the truth."

In addition, the court said:

> [T]his offense was committed while . . . defendant was on bail, awaiting trial on [the first indictment]. . . . Again, being back at [the] property, failing to acknowledge that the bank had taken it in a lawful judgment and then refusing to submit to law enforcement when they said you are trespassing, you're under arrest.

In analyzing the aggravating and mitigating factors, the judge found aggravating factor three, the risk defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3), was applicable because defendant's criminal history reflected "he d[id] not listen" and "[did] not respect the law." The judge also found aggravating factor six, the extent of defendant's prior criminal record, N.J.S.A. 2C:44-1(a)(6), was applicable due to the increasing seriousness of

11

A-4178-18

defendant's convictions over time.  In addition, the judge found aggravating factor nine, the need for deterring defendant and others, N.J.S.A. 2C:44-1(a)(9), because "[w]e all have a duty to submit to the law and follow the rule of law." The judge did not find any mitigating factors.

Because the State requested defendant be sentenced consecutively to the four-year sentence imposed under the prior indictment, the judge turned to an analysis of the factors enunciated under <u>State v. Yarborough</u>.[2]  The judge concluded defendant had committed two separate crimes as they were not temporally related and had different victims.  Therefore, the court sentenced defendant to a term of 18 months' imprisonment to run consecutive with his prior sentence.  The court also ordered a permanent injunction barring defendant from returning to the property or contacting Kevin and Janine directly or indirectly.

Defendant presents the following points for our consideration:

> POINT I.   THE STALKING CONVICTION MUST BE REVERSED BECAUSE DEFENDANT WAS DENIED A FAIR TRIAL BY THE STATE'S INTRODUCTION OF HEARSAY TESTIMONY THAT ALLEGED THAT THE POLICE HAD BEEN CALLED ON DEFENDANT ON NINE PRIOR OCCASIONS FOR TRESPASSING ON THE SAME PROPERTY INVOLVED IN THE CHARGED OFFENSE.

---

[2]  100 N.J. 627, 643-44 (1985).

A-4178-18

POINT II. THE MAXIMUM CONSECUTIVE SENTENCE IS MANIFESTLY EXCESSIVE, UNDULY PUNITIVE, AND SHOULD BE REDUCED.

Defendant contends he was deprived of a fair trial because the State was permitted to introduce hearsay evidence during Officer Cahill's testimony. He asserts it was error for the court to allow Cahill to read to the jury the rest of the first paragraph in the police report from which defendant had previously asked Cahill to read a single sentence. Defendant contends this testimony portrayed him as "predisposed to commit crime," "bore no relevance to the charged offense of stalking", was "not accompanied by a proper limiting instruction", and "unfairly undercut the reasonableness of [his] continued belief that he had an ownership interest in the property, which was central to his defense." Because there was no objection to the evidence, we review for plain error. R. 2:10-2.

Hearsay is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." State v. Brown, 236 N.J. 497, 522 (2019) (citing N.J.R.E. 801(c)). Hearsay may not be admitted into evidence unless it falls within one of the exceptions provided by the rules of evidence or "other law." N.J.R.E. 802.

A-4178-18

One such exception is the invited error doctrine, which "is intended to 'prevent defendants from manipulating the system' and will apply 'when a defendant in some way has led the court into error' while pursuing a tactical advantage that does not work as planned." State v. Williams, 219 N.J. 89, 100 (2014) (citing State v. A.R., 213 N.J. 542, 561 (2013)).  Under this "settled principle of law, trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal . . . .'" A.R., 213 N.J. at 561 (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)).

Here, it was defendant who elicited the testimony from Cahill that he now claims deprived him of a fair trial.  During his cross-examination of Cahill, defendant inquired whether the officer was aware that "[the police] had problems with knowing the ownership of the property?"  When the prosecutor objected, defendant responded that he had an officer's "written report that [said] just that."  The judge sustained the objection.

At the subsequent sidebar, the prosecutor informed the judge that defendant was attempting to have Cahill read a single line from another officer's report without any context for it.  The prosecutor told the judge that defendant used the same strategy in his earlier trial on the prior charges.  However, in the

14

A-4178-18

earlier trial, the officer who authored the report was present to testify and explain his statement.  That officer had not been called as a witness in the present trial.

The judge sustained the State's objection, saying: "[D]efendant also doesn't even know whether [Patrolman Cahill] ever saw that report.  So, we're going down a road that we're not going down. Let's move on."  However, defendant ignored the judge's direction and immediately sought to introduce the police report through Cahill's testimony by asking the officer to read the following line: "from January 1, 2016 to September 13, 2016, TFPD has been called to [the property] nine times for issues pertaining to ownership of the property."  Defendant then asked Cahill whether police were able to "find out" who the "true owners[]" were; defendant ended his questioning after Cahill responded "no."

It was defendant who introduced the testimony that the police had been called to the property on nine prior occasions when defendant was unlawfully at the home, and the colloquy makes clear that he did so as part of a deliberate strategy.  Defendant wanted Cahill to read a single line without context from a police report he did not write and may never have seen to support defendant's argument that the police were unaware whether defendant was the true owner of

15

the property.  Evidently, defendant employed the same strategy in his earlier trial.

Defendant's conduct is precisely the sort of manipulation prohibited by the invited error doctrine.  <u>Williams</u>, 219 N.J. at 100.  Defendant not only introduced the testimony by directing Cahill to read it but did so after the court sustained the State's objection and told defendant to "move on."  Now that defendant's strategy proved unsuccessful, he cannot argue the testimony he intentionally introduced deprived him of a fair trial, requiring a reversal of his conviction.  Such a conclusion would fly in the face of the invited error doctrine's underpinnings of "common-sense" and "considerations of fairness . . . ."  <u>A.R.</u>, 213 N.J. at 562 (citation omitted).

It also was not error for the court to permit the State to direct Cahill to read the remainder of the paragraph in the police report from which defendant asked him to read earlier.  Under the doctrine of completeness, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part, or any other writing or recorded statement, that in fairness ought to be considered at the same time."  N.J.R.E. 106.  This doctrine permits further reading from a writing or the reading of a second writing where "it is necessary to (1) explain the admitted portion,

A-4178-18

(2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding." State v. Lozada, 257 N.J. Super. 260, 272 (App. Div. 1992) (citation omitted).

Here, it was proper for Cahill to read the remainder of the first paragraph in the police report to place the statement into context. Otherwise, the jury might have been unclear about what the writer meant by "issues pertaining to the ownership of the property." This is particularly true because the officer who authored the report was not in court to testify about his meaning of the phrase.

The State objected to the use of the hearsay report. The court sustained the objection. Nevertheless, defendant ignored the court's ruling and introduced the testimony he now asserts is improper hearsay. Once he elicited the testimony, the door was open for the State to request a complete reading of the report so the jury would hear the entire context of the statement. The invited error doctrine prohibits defendant from now asserting his own actions as reversible trial error. Moreover, defendant has not demonstrated the introduction of the statement in the police report was an error "clearly capable of producing an unjust result" as required under Rule 2:10-2. Defendant admitted he went to the victims' home and property uninvited on all three

17

occasions. There was ample evidence from which a jury could find defendant guilty of the stalking charge.

Defendant also asserts the trial court erred in sentencing him to the maximum lawful sentence of eighteen months' incarceration.[3] He contends his criminal record should have only afforded aggravating factors three, six, and nine "at most, moderate weight." Defendant further contends the court "overlooked clearly applicable mitigating factors", specifically his nearly twelve years of military service and the fact that he was suffering from Parkinson's disease.

We are bound to uphold the trial court's sentence, even if we would have reached a different result, unless "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found . . . were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts . . . makes the sentence clearly unreasonable so as to shock the judicial conscience.'" State v. Fuentes, 217 N.J. 57, 70 (2014) (quoting Roth, 95 N.J. 334, 364-65 (1984)); see also State v. Bieniek, 200 N.J. 601, 608 (2010); State v. O'Donnell, 117 N.J. 210, 215-16 (1989). It is not required that the trial

---

[3] Defendant does not challenge the imposition of consecutive sentences.

court explicitly reject each and every factor if we can discern the reasons from the record. Bieniek, 200 N.J. at 609.

We are satisfied the trial court did not violate the sentencing guidelines or impose an unreasonable sentence and its application of the aggravating and mitigating factors was based upon competent and credible evidence in the record.

In finding the specific aggravating factors, the court found defendant manifested an utter disregard for the court's authority and the rule of law before, during, and after he was convicted. He repeatedly returned to the property despite numerous warnings from law enforcement not to do so, resulting in two arrests. He committed the acts underlying the present conviction while on bail awaiting trial for a prior indictment under which he was charged with similar conduct. The judge's finding of the aggravating factors was supported by ample evidence in the record.

Defendant did not request or raise any pertinent mitigating factors during the sentencing hearing. He did not advise the court of a diagnosis of Parkinson's disease. Before us, defendant has not specified which mitigating factors were applicable to him. Instead, he generally asserts the judge should have weighed his military service and Parkinson's disease against the applicable aggravating

factors. There is no evidence presented to support defendant's medical condition or whether it bore any relation to his conduct. We are satisfied the judge properly weighed the factors.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office

CLERK OF THE APPELLATE DIVISION

20

A-4178-18